UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

CIVIL ACTION NO. 04-510

JAMES E. FRANCIS,                                                                                         PLAINTIFF

v.                                          **OPINION AND ORDER**

NAMI RESOURCES COMPANY, LLC,                                                          DEFENDANT

* * * * * * * * *

This matter is before the Court on the Motions to Compel Arbitration and Stay Action (Rec. Nos. 89 and 90) filed by the Defendant Nami Resources Company, LLC ("NRC"). For the following reasons, the Court hereby DENIES the motions.

**I.      FACTS.**

**A.      The 1999 Agreements.**

NRC owns certain oil and gas leases (the "Leases") covering lands located in Whitley, Clay and Knox Counties, Kentucky. (Rec. No. 7, Ex. D, Participation Agreement, Recitals). In 1999, NRC and the Plaintiff James E. Francis ("Francis") entered into three written agreements regarding ten wells leased to NRC (the "1999 Wells"). These agreements were a Participation Agreement[1], an Operating Agreement and a Promissory Note (the "1999 Agreements"). (Rec. No. 7, Ex. D, E and F). The 1999 Agreements contained the following provisions relevant to this action:

---

[1] NRC does not submit any of the agreements with this motion. The parties have filed various documents in the record which they allege are the 1999 Participation Agreement. These documents vary. For example, and particularly relevant to this motion, the "1999 Participation Agreement" submitted with NRC's Amended Answer and Counterclaim (Rec. No. 21, Exhibit A) is not signed by any party and does not appear to contain an arbitration clause at all. The "Participation Agreement" submitted with NRC's original Answer and Counterclaim, however, is signed and contains an arbitration clause. For purposes of this motion and any future motions, with no objection, the Court will consider the versions of the 1999 Agreements and 2000 Agreements submitted with NRC's Answer and Counterclaim (Rec. No. 7).

- **Cash Payment to NRC**: Francis agreed to pay NRC $1.12 million for the "right to participate in the drilling and completion of ten wells." (Rec. No. 7, Ex. D, Participation Agreement, § I).
- **Promissory Note**: Francis agreed to pay $836,000 of the $1.12 million in cash payments which were to be completed by August 2000. The balance was to be paid on a monthly basis from production proceeds of the last seven wells drilled. (Rec. No. 7, Ex. F, Promissory Note),
- **Arbitration Agreement** – the first three were to be drilled and producing "economically feasible amounts of gas" – defined as 1350 MCR/ month/well – no later than June 10, 2000. If the first three wells were producing less than "economically feasible amounts of gas" then the parties were to agree upon an "exchange of wells." If the parties could not agree on an exchange of wells, they agreed this matter would be submitted to arbitration. (Rec. No. 7, Ex. D, Participation Agreement, § I(C)).
- **Amendments to Participation Agreement**: The parties agreed that the Participation Agreement could not be amended except in writing. (Rec. No. 7, Ex. D, Participation Agreement, § X(2)).
- **Operating Agreement Scope**: The parties agreed to sign an Operating Agreement that would govern the operation of the wells. The parties also agreed that "[m]atters relating to drilling, completing and operating of the Wells . . .not specifically provided for in [the Participation Agreement] and matters relating to all subsequent operations on the Wells will be governed by the Operating Agreement." (Rec. No. 7, Ex. D, Participation Agreement, § IV).
- **Operating Fee**: Francis agreed to pay NRC an Operating Fee of $260 per month per well. (Rec. No. 7, Ex. E, Operating Agreement, § 1(a)). The Operating Fee included "all expenses in regards to the operations of the subject well(s)." (Rec. No. 7, Ex. E, Operating Agreement, § 1(b)).
- **Other expenses**: The parties agreed that NRC would not charge Francis additional expenses without Francis's prior written consent. (Rec. No. 7, Ex. E, Operating Agreement, § 1(b)).
- **Payments to Francis**: The Parties agreed that "NRC shall disburse the oil and gas working interest payments to Francis no later than 55 days after the last production day of the month. Such payments shall accompany a statement showing details of oil and gas production, payments and expenses." (Rec. No. 7, Ex. E, Operating Agreement, § 2).
- **Amendments to Operating Agreement**: The parties agreed that the Operating Agreement could only be amended in writing and could not be "modified or revised without the written consent and authority of the parties." (Rec. No. 7, Ex. E, Operating Agreement, §§ 10, 11).

B.   **The 2000 Agreements.**

The parties also drafted certain agreements in 2000 regarding six additional wells leased to

NRC (the "2000 Wells")[2]. These agreements were a Participation Agreement, an Operating Agreement and a Selling Agreement (the "2000 Agreements"). (Rec. No. 7, Ex. A, B and C). NRC asserts that these agreements were, in fact, executed. Francis asserts that the written agreements were not executed but states that the parties orally agreed to the terms contained in the 2000 Agreements. The 2000 Agreements contained the following provisions relevant to this action:

- **Drilling and Completion Phases**: the parties agreed that development of the wells would be divided into two phases: drilling and completion. (Rec. No. 7, Ex. A, Participation Agreement, § I).
- **Drilling Phase:** Francis agreed to pay NRC $100,000 to drill each well. NRC was to obtain written approval from Francis before drilling each well. Francis agreed to advance NRC $132,000 within five days of the approval of each well. NRC agreed to hold in escrow $32,000 of this payment. (Rec. No. 7, Ex. A, Participation Agreement, § I).
- **Agreement before Completion Phase**: the parties agreed that, after the drilling phase, they would mutually determine whether "it is economically feasible to proceed with the completion phase for each Well. If the parties mutually agree to proceed with the completion phase such mutual agreement shall be evidenced in writing." (Rec. No. 7, Ex. A, Participation Agreement, § I).
- **Completion Costs:** If the parties agreed to proceed with the completion phase, the $32,000 in escrowed funds were to be used for the necessary and ordinary expenses of the completion of the well. (Rec. No. 7, Ex. A, Participation Agreement, § I).
- **Completion Costs of Less than or Greater than $40,000:** If the actual cost of completion for each well was less than $40,000, then NRC agreed to hold 80% of the surplus in trust and to credit the surplus toward completion costs on other wells. If the costs of completion on any well exceeded $40,000, then NRC agreed to give Francis written notice along with documentation of the expenses incurred. Francis agreed to pay 80 percent of the deficit within five business days of receiving such notice. (Rec. No. 7, Ex. A, Participation Agreement, § I).
- **Records of Completion Costs**: NRC agreed to keep books and record of expenses incurred and to provide a monthly report of expenses and make books and record available to Francis for inspection or audit. (Rec. No. 7, Ex. A, Participation Agreement, § I).
- **No Agreement Before Completion**: If the parties could not agree to proceed with completion of a well, then either party could complete the well by paying all completion costs. That party could then retain 100% of the profits from the well until the party had recovered 300% of the necessary and ordinary expenses for the

---

[2] The parties agree that the 2000 Agreements covered six additional wells. All versions of the 2000 Participation Agreement in the record, however, state that the agreement covers ten wells.

- completion phase. (Rec. No. 7, Ex. A, Participation Agreement, § I).
- **Arbitration** – the parties agreed that "[i]n the event the parties are unable to agree upon substantive matters of this Agreement disputes shall be submitted to arbitration." (Rec. No. 7, Ex. A, Participation Agreement, § I).
- **Scope of Operating Agreement** – the parties agreed to sign an Operating Agreement and that, "[e]xcept as specifically provided for in [the Participation Agreement], the Operating Agreement shall govern the operation of the Wells and the relationship between [NRC] and Francis in connection with the Wells. Matters relating to drilling, completing and operating of the Wells. . .not specifically provided for in [the Participation Agreement] and matters relating to all subsequent operations on the Wells will be governed by the Operating Agreement." (Rec. No. 7, Ex. A, Participation Agreement, § IV).
- **Amendments to Participation Agreement** – the parties agreed that the Participation Agreement could not be amended except in writing. (Rec. No. 7, Ex. A, Participation Agreement, § X(B)).
- **Operating Fee** – Francis agreed to pay NRC an operating fee of $260 per month per well. In the event any well produced more than 2100 gallons of oil for more than 30 days, Francis agreed to pay an Operating Fee of $450 per month for those months that the well produced more than 2100 gallons. (Rec. No. 7, Ex. B, Operating Agreement, § 1(a)). The Operating Fee would include all expenses regarding "the operations of the subject well(s), such as service rig work, material, transportation fees and other miscellaneous charges to produce such oil and gas wells." The parties agreed that "NRC shall not charge Francis additional expenses without prior written consent of Francis." (Rec. No. 7, Ex. B, Operating Agreement, § 1(b)).
- **Payments to Francis** – the parties agreed that "NRC shall disburse the oil and gas working interest payments to Francis no later than 55 days after the last production day of the month. Such payments shall accompany a statement showing details of oil and gas production, payments and expenses." (Rec. No. 7, Ex. B, Operating Agreement, § 2).
- **Amendments to Operating Agreement** – the parties agreed that the Operating Agreement could only be amended in writing. (Rec. No. 7, Ex. B, Operating Agreement, § 10). The parties agreed that the Operating agreement could "not be modified or revised without the written consent and authority of the parties." (Rec. No. 7, Ex. B, Operating Agreement, § 11).

### 3) This Action.

On October 12, 2004, the Plaintiff James E. Francis filed this action asserting the following claims:

1) breach of contract: Francis asserts that NRC breached the 1999 and 2000 Agreements by failing to pay him for the gas produced from the wells as he was required to do. (Rec. No. 1, Complaint, Count I).

4

2)     breach of the implied covenant of good faith and fair dealing: Francis asserts that NRC breached the covenant of good faith and fair dealing in both the 1999 and 2000 Agreements by sending him altered invoices regarding its costs. (Rec. No. 1, Complaint, Count II).

3)     conversion: Francis asserts that NRC's retention of the production proceeds from the 1999 Wells and the 2000 Wells constitutes conversion of those proceeds. (Rec. No. 1, Complaint, Count III).

4)     unjust enrichment: Francis asserts that he paid NRC $1,500,000 to drill 16 wells and that NRC is unjustly withholding production payments from Francis. (Rec. No. 1, Complaint, Count IV).

5)     constructive trust: Francis asserts that NRC's withholding of production payments from Francis is fraudulent because it is based on false representations as to the cost of the work performed on the 1999 and 2000 Wells. Thus, Francis asserts, NRC holds the revenues as constructive trustee for the benefit of Francis. (Rec. No. 1, Complaint, Count V).

Francis seeks consequential and special damages and exemplary and punitive damages. Francis also seeks rescission of the agreements and the return of his investment with interest. (Rec. No. 1, Complaint at 9). On August 30, 2006, NRC filed the current Motion to Compel Arbitration and Stay Action (Rec. Nos. 89 and 90).

## II. ANALYSIS.

With its current motion, NRC argues that the 1999 Participation Agreement requires the parties to submit to arbitration any dispute regarding "the substitution of certain wells." (Rec. No. 89, Motion at 1). Specifically, NRC points to the following provision in the 1999 Participation Agreement:

> The parties further agree that wells 1,2, & 3 shall be drilled and producing economically feasible amounts of gas no later than June 10, 2000. Economically feasible for purpose of this paragraph shall means that the wells are producing in aggregate at least 1350 MCF/month/per well. If wells 1, 2 & 3 are producing substantially less than an economically feasible amount of gas then the parties hereto shall mutually agree upon an exchange of wells. In the event the parties are unable to agree upon an exchange then the matter shall be submitted to arbitration.

(Rec. No. 7, Ex. D, Participation Agreement § I(C)).

It is undisputed that the first three wells drilled pursuant to the 1999 Agreements did not produce economically feasible amounts of gas. With its Motion to Compel, NRC alleges that, in November 2000, it proposed a well substitution which Francis rejected. It further alleges that it proposed another well substitution which Francis accepted in January 2001. However, the substitute wells failed to produce economically feasible amounts of gas.

On October 12, 2004, Francis filed this Complaint. On July 3, 2006, NRC sent Francis a letter proposing another well substitution. (Rec. No. 89, Ex. A). NRC argues that, because Francis has not responded to this proposed exchange, the matter must be submitted to arbitration. NRC further argues that this litigation cannot continue until the well exchange issue is arbitrated. This is because, according to NRC, "the sole issue in this case is what amount, if any, may be due to Francis for the production from his wells," including the first three wells. According to NRC, if the parties cannot agree on a well exchange for the first three wells, the amount of gas produced from all the wells subject to the agreements cannot be calculated. NRC argues that this action must be stayed pursuant to 9 U.S.C. § 3[3] and 4[4].

---

[3] Section 3 of Title 9 provides:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

[4] Section 4 of Title 9 provides:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default. Service thereof shall be made in the

### A. Waiver of Arbitration.

Francis does not dispute that the parties agreed to submit the issue of the well exchange to arbitration. He argues that NRC has waived its right to arbitration because the parties knew in November 2000 that the three original wells would not produce an economically feasible amount of gas. The arbitration provision, however, applies only "[i]n the event the parties are unable to agree upon" the exchange of wells. (Rec. No. 7, Participation Agreement, Ex. D, § I(C)). The earliest that any disagreement between the parties on the well exchange could have arisen would have been July 3, 2006, the date of the letter in which NRC proposed three substitute wells. This Motion to Compel was filed on August 30, 2006. Accordingly, NRC has not waived any right to arbitration of the well exchange issue under the 1999 Participation Agreement.

### B. Whether an Arbitrable Dispute Exists.

Francis also argues that there is no disagreement between the parties that requires arbitration. Again, under the 1999 Participation Agreement, the parties' obligation and right to arbitrate arises only "[i]n the event the parties are unable to agree upon" an exchange of wells. Francis concedes

---

manner provided by the Federal Rules of Civil Procedure. The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed. If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof. If no jury trial be demanded by the party alleged to be in default, or if the matter in dispute is within admiralty jurisdiction, the court shall hear and determine such issue. Where such an issue is raised, the party alleged to be in default may, except in cases of admiralty, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose. If the jury find that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury find that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

that, after he filed this action, he received the July 3, 2006 letter from NRC containing a proposed well exchange. He alleges that his counsel requested production records for the three proposed wells from NRC's counsel but that NRC never provided those records and instead filed this Motion to Compel Arbitration. Francis submits a letter dated September 14, 2006 from his counsel to NRC's counsel stating:

> Mr. Francis is willing to consider the well substitution NRC proposed. . . As we discussed, however, Mr. Francis would like to review the production records for the proposed wells from June 2001 to the present. . . Once we have received the records, we will be in a position to continue discussions about the substitution. Until then, it is impossible for Mr. Francis to make an informed decision one way or another.

(Rec. No. 95, Response, Ex. A).

There is no evidence in the record that Francis ever disagreed with the proposed well exchange. Instead, the sole evidence is that he requested additional information regarding the proposal. Because there is no evidence that the parties are "unable to agree upon" the well exchange, there is no evidence that a dispute exists to submit to arbitration.[5]

NRC has not disputed whether this Court should decide whether the parties are "unable to agree" upon the well exchange such that the issue is subject to arbitration. The Participation Agreement itself does not state which party is to make this determination. When confronted with a motion to compel arbitration, it is this Court's duty to "determine whether the parties agreed to arbitrate the dispute at issue." *Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). Because it is the Court's duty to determine whether an actual dispute between the parties is subject to the

---

[5]Assuming that a dispute between the parties should arise regarding the proposed well exchange that would require arbitration, the Court does not believe that such an arbitration would require a stay of this action. With his Complaint, Francis alleges that NRC failed to pay him for gas produced from the wells that have already been drilled under the 1999 and 2000 Agreements (Rec. No. 1, Complaint, Count I) and that NRC altered certain invoices regarding its costs on these wells (Rec. No. 1, Complaint, Count II). The resolution of any dispute between the parties regarding any additional wells that will become subject to the agreement will have no bearing on the claims asserted by Francis in this action.

8

arbitration clause, it follows that, in the absence of any contractual language to the contrary, it is this Court's duty to determine whether there is, in fact, a dispute between the parties requiring arbitration. *See Alpha Beta Company v. Retail Store Employees Union*, 671 F.2d 1247, 1250 (9th Cir. 1981) (party seeking arbitration must establish that a dispute exists); *Chicago Typographical Union v. Chicago Sun-Times*, 860 F.2d 1420, 1425-26 (7th Cir. 1988)(same).

Because the evidence in the record does not show that the parties are "unable to agree upon" the proposed well exchange, it is hereby ORDERED that NRC's Motion to Compel Arbitration and Stay Action (Rec. Nos. 89 and 90) is DENIED.

Dated this 13th day of November, 2006.

Signed By:
*Karen K. Caldwell* KKC
United States District Judge