UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO.  04-510

JAMES E. FRANCIS,                                                                PLAINTIFF,

v.                                    **OPINION AND ORDER**

NAMI RESOURCES COMPANY, LLC,                                     DEFENDANT.

* * * * * * * * *

This matter is before the Court on the Plaintiff's Renewed Motion for Partial Summary Judgment (Rec. No. 104) and the Defendant's Renewed Motion for Partial Summary Judgment (Rec. No. 105).

This dispute revolves around certain agreements between the parties regarding 16 oil and gas wells.  The Plaintiff, James E. Francis ("Francis") claims that, pursuant to those agreements, the Defendant Nami Resources Company, LLC ("NRC"), should be paying him some of the revenue produced by the wells. NRC argues that it has the right to withhold the revenue because Francis failed to pay his share of the expenses of producing the gas from the wells.  Both parties have moved for partial summary judgment.

Francis asserts a breach of contract claim against NRC, claiming that NRC breached two sets of agreements between the parties.  Francis also asserts bad faith, conversion, and unjust enrichment claims against NRC. As to remedies, in addition to compensatory damages, Francis requests rescission, a constructive trust, punitive damages, and pre-judgment interest.

In his Motion for Partial Summary Judgment, Francis moves for judgment as a matter of law on his breach of contract claims.  He also asks the Court to rule as a matter of law that he is entitled to the remedies of rescission and pre-judgment interest.   In its Motion for Partial Summary

Judgment, NRC moves for judgment as a matter of law in its favor on the other claims asserted by Francis – bad faith, conversion, and unjust enrichment. NRC also asks the Court to rule as a matter of law that Francis is not entitled to the remedies of rescission, a constructive trust or punitive damages.

For the following reasons, the Court will deny Francis's Motion for Partial Summary Judgment and will grant NRC's Motion for Partial Summary Judgment.

## I. FRANCIS'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CLAIM FOR BREACH OF 1999 AGREEMENTS.

### A. FACTS REGARDING THE 1999 AGREEMENTS.

The oil and gas wells at issue in this case are located in Whitley, Clay and Knox Counties, Kentucky. (Rec. No. 7, Ex. D, Participation Agreement, Recitals). NRC leases the oil and gas wells. In 1999, NRC and Francis entered into three written agreements regarding ten of the wells (the "1999 Wells"). These agreements were a Participation Agreement[1], an Operating Agreement and a Promissory Note (the "1999 Agreements"). (Rec. No. 7, Ex. D, E and F). The 1999 Wells are identified by the following names: Henry Ledford #1, Randall Wagers #2, Randall Wagers #4, Vivian Wagers #1, Maudie Napier #5, Neiman-Nolan #1, Bell Helton #1, Reed Helton #1, Bill Mayne #1, and Maudie Napier #4.

### 1) Francis Pays NRC $1.12 Million.

With these agreements, Francis agreed to pay NRC $1.12 million for the "right to participate in the drilling and completion of ten wells." (Rec. No. 7, Ex. D, Participation Agreement, § I). Francis agreed to pay $836,000 of the $1.12 million in cash payments which were to be completed

---

[1] As the Court has informed the parties in prior Orders (See Rec. No. 114,Opinion and Order at 1 n.1; Rec. No. 100, Opinion and Order at 1 n.1), the Court has considered the versions of the 1999 Agreements and 2000 Agreements submitted with NRC's original Answer and Counterclaim to be the final versions of the written documents (Rec. No. 7).

2

by August 2000.  The balance was to be paid on a monthly basis from production proceeds of the last seven wells drilled. (Rec. No. 7, Ex. F, Promissory Note). Thus, until the Note was paid, Francis would only be entitled to revenue from the first three wells drilled.  There is no dispute that Francis met his obligations or is meeting his obligations under the Promissory Note.

### 2)      Francis Pays $260 per Month Operating Fee for Each Well.

Francis agreed to pay NRC an Operating Fee of $260 per month per well.  (Rec. No. 7, Ex. E, Operating Agreement, § 1(a)). The Operating Fee included "all expenses in regards to the operations of the subject well(s)."  (Rec. No. 7, Ex. E, Operating Agreement, § 1(b)). The parties agreed that NRC would not charge Francis additional expenses without Francis's prior written consent. (Rec. No. 7, Ex. E, Operating Agreement, § 1(b)).

### 3)      NRC Pays Francis "Working Interest Payments."

The Parties agreed that "NRC shall disburse the oil and gas working interest payments to Francis no later than 55 days after the last production day of the month.  Such payments shall accompany a statement showing details of oil and gas production, payments and expenses." (Rec. No. 7, Ex. E, Operating Agreement, § 2).

### 4)      Amendments to Agreements Must be in Writing.

The parties agreed that the Participation Agreement could not be amended except in writing. (Rec. No. 7, Ex. D, Participation Agreement, § X(2)).  The parties also agreed that the Operating Agreement could only be amended in writing and could not be "modified or revised without the written consent and authority of the parties."  (Rec. No. 7, Ex. E, Operating Agreement, §§ 10, 11).

### 5)      Francis's Claim for Breach of 1999 Agreements.

There is no dispute that, in April 2001,  NRC stopped paying Francis revenue from the sale of oil and gas from the 1999 Wells.  NRC argues that it was entitled to withhold the revenues

because Francis refused to pay his share of the expenses to treat and stimulate the wells in order to increase their production.

In his deposition, Majeed S. Nami, the sole member of NRC, testified that Francis was not obligated to pay for treatment or stimulation of the 1999 Wells under the terms of the written 1999 Agreements.  (Rec. No. 77, Nami Dep. at 98-99 (testifying that, under the written 1999 Agreements, the Operating Fee and Francis's initial investment of $1.12 million covered all expenses associated with the 10 1999 Wells and that Francis was not obligated to pay any other expenses and that to the extent any charges have been made to Francis for the 1999 Wells, those expenses are not covered by the written agreements but were instead covered by oral agreements)).[2]

NRC asserts, however, that, some time after the parties signed the 1999 Agreements, Francis orally agreed to pay some portion of the expenses of treating and stimulating the wells in order to increase their production. In its briefs filed with the Court, NRC has not articulated precisely what portion Francis agreed to pay.  Nevertheless, reviewing the correspondence and other evidence in the record, the Court has concluded that NRC is asserting that Francis orally agreed to pay 80 percent of the costs to treat and stimulate the 1999 Wells and NRC orally agreed to pay 20 percent of those costs. (Rec. No. 77, Nami Dep. at 160 (stating with reference to the 1999 Wells that Francis agreed to pay his share of the treatment costs); Rec. No. 73, Ex. B to Ex. O, Aug. 2, 2002 Nami Letter (charging Francis 80 percent of the treatment and stimulation costs of 1999 Wells)).

NRC argues that, given this agreement, even if it was not entitled to withhold the production

---

[2] Despite these statements, NRC argues in its response brief that the 1999 Agreements are ambiguous and may be read to require that Francis pay for all of the treatment and stimulation of the wells. Because the Court has denied summary judgment on Francis's breach of contract claim on the grounds that there is sufficient evidence to support NRC's alternative theory, i.e., that Francis actually agreed to treat and stimulate the wells in an oral agreement made after the 1999 Agreements were executed, the Court need not address NRC's argument that the parties actually intended for Francis to pay for the treatment and stimulation of the wells when they signed the 1999 Agreements.

revenue from the 1999 Wells under the 1999 Agreements, Francis breached the agreements first by failing to pay his share for the treatment and stimulation of the wells as he orally agreed to do, thereby excusing NRC's failure to pay Francis production revenues. *See Dalton v. Mullins*, 293 S.W.2d 470, 476 (Ky. 1956)(stating that "the party first guilty of a breach of contract cannot complain if the other party thereafter refuses to perform")[3].

**B.    ANALYSIS.**

**1)    Whether NRC has Submitted Sufficient Evidence of an Oral Amendment to the 1999 Agreements.**

The first issue on Francis's claim for breach of the 1999 Agreements is whether there is sufficient evidence that Francis orally agreed to pay a share of the treatment and stimulation expenses.  As evidence of the oral agreement, NRC cites pages 141, 154, 155, 156, 158, 160,162, and 187 of Nami's deposition. (Rec. No. 108, Response at 8, 10, 19).

On page 141, Nami testified that Francis agreed to pay the actual costs of operating the wells instead of just the $260 per month Operating Fee and that he also agreed to pay to "frak" the wells. On page 154, Nami discussed a letter Francis wrote to him dated January 16, 2001 in which Francis states that he looks forward to working with NRC  on the completion of certain wells. Francis names four wells in particular one of which is a 1999 Well (Reed Helton #1).

On page 155, Nami testified that he and Francis discussed how to increase production of the wells and Francis agreed to "bear the costs" for the 1999 Wells and that "we agreed on everything

---

[3]  In his deposition, Nami testified that NRC was entitled to withhold from Francis production revenues from the 1999 Wells pursuant to an "industry standard."  He testified it is an industry standard for the partner who paid for treatment of a well to recover 300% of the treatment costs before disbursing any revenues to his other partners.  (Rec. No. 77, Nemi Dep. at 161).  In its response to Francis's Motion for Summary Judgment, however, NRC does not rely on the "industry standard" to justify its failure to pay Francis production revenues as it was obligated to do under the 1999 Agreements.  Instead, NRC relies on the argument that Francis was obligated to pay for at least some of the expenses to treat and stimulate the wells and, so, he breached the agreement first.  Accordingly, the Court has not addressed the "industry standard" argument put forth by Nami in his deposition.

and – and shook hand[s] on it and he was supposed to send me a check for 130 some thousand dollars and for us to continue to provide him with recommendation even on – on a couple of 1999 wells." He also testified that Francis never denied NRC authorization to treat and stimulate the wells before NRC undertook the treatment and stimulation. On page 156, Nami testified that Francis gave him authorization to treat at least some of the wells.  On page 160, Nami testified that Francis complained that the wells were not producing enough and so he and Francis agreed to treat the wells and to share the expenses.  On page 162, Nami appears to be referring to treating the wells when he states, "[h]e authorized them and then he changed his mind."  On page 182, there are no relevant statements by Nami.  On page 187, Nami refers to "treatment," and the "1999 charges" and states "[w]e were supposed to do things and he – he agreed he was going to pay his share of them."

In addition, by an undated letter from Francis to Barry Hayes, Chief Financial Officer of NRC, Francis states that he would like to consider treating four wells: Emmanuel Jackson #1,  Reed Helton #1, Mike & Delbert Helton #1, and Kenneth Engle #1.  One of these wells is a 1999 Well.

Under Kentucky law, "a written contract can be modified or abandoned by a subsequent oral agreement, [but] the proof to support such an assertion must be clear and convincing." *Dalton*, 293 S.W.2d at 475. This standard means that "the evidence must not be vague, ambiguous, or contradictory, and must come from a credible source." *Wehr Constructors, Inc. v. Steel Fabricators*, *Inc.*, 769 S.W.2d 51, 54 (Ky.App.1988). The evidence of the oral modification does not, however, "have to be undisputed or uncontradicted." *Id*.

While the evidence submitted by NRC in support of the alleged oral modification of the 1999 Agreements is not undisputed or uncontradicted, standing alone it is nonetheless sufficient to submit the issue to a jury who can weigh the contradictory evidence and make credibility determinations as necessary to determine whether there is clear and convincing evidence that the parties orally

6

modified the 1999 Agreements. *See Glass v. Bryant*, 194 S.W.2d 390, 393 (Ky. 1946) (stating that, under the clear-and-convincing standard, "it is the fact-finding body that must be convinced. It hears the evidence and is charged with the duty of passing upon the credibility of witnesses.")

> **2)     Whether the Statute of Frauds Prohibits NRC from Asserting an Oral Amendment to the 1999 Agreements.**

Even if there is sufficient evidence of the oral agreement, there is a legal issue as to whether NRC may assert the oral agreement as a defense to Francis's breach of contract claims.  The parties agree that this matter is to be governed under Kentucky law.  The Kentucky statute of frauds provides that "no action shall be brought to charge any person. . . (6) Upon any contract for the sale of real estate, or any lease thereof for longer than one year" unless the contract is in writing and signed "by the party to be charged therewith. . ." KRS § 371.010(6).  "The conveyance or assignment of a working interest in an oil and gas lease constitutes an interest in real estate within the meaning of the statute of frauds." *Owen v. Dayson*, 562 S.W.2d 647, 648 (Ky. App. 1977).  There is no dispute that the 1999 Agreements conveyed to Francis a working interest in the ten 1999 Wells. (See, e.g., Rec. No. 105, NRC Mem. at 1; Rec. No. 104, Francis Mem. at 1). Accordingly, the 1999 Agreements are subject to the statute of frauds.

Because the original contracts falls within the statute of frauds, the alleged agreement by Francis to pay for the treatment and stimulation of the 1999 Wells must also be in writing if it materially affects the terms of the 1999 Agreements. *Farmers Bank and Trust Co. of Georgetown, Ky. v. Wilmott Hardwoods,* Inc., 171 S.W.3d 4, 8 (Ky. 2005); *see also Cox v. Venters*, 887 S.W.2d 563, 566 (Ky. App. 1994)("Where a contract is required by the statute of frauds to be in writing, a subsequent agreement which changes its terms must also be written and signed by the party to be charged to be enforceable." ); *Wilson v. Adath Israel Charitable & Educational Ass'n*, 89 S.W.2d

318, 320 (Ky. 1935).

The parties have not addressed whether the alleged oral agreement by Francis to pay for the treatment and stimulation of the 1999 Wells worked a material amendment to the 1999 Agreements. The Court need not resolve this issue, however, because the statute of frauds applies only to actions, not defenses. *Midwest Mut. Ins. Co. v. Wireman*, 54 S.W.3d 177, 181 (Ky. App. 2001); *Drake v. Rowe*, 172 S.W. 1068 (Ky. App. 1915); KRS § 371.010 (prohibiting only actions to "charge any person" upon the listed oral agreements). Accordingly, even if the alleged amendment to the 1999 Agreements falls under the statute of frauds, thus prohibiting any action to enforce it, the statute does not prohibit NRC from asserting the oral agreement as a defense to Francis's breach of contract claim.

### 3) Whether the 1999 Agreements Prohibit NRC from Asserting an Oral Amendment.

The next issue is the effect of the provisions in the 1999 Agreements requiring that all amendments be in writing. Under Kentucky law, parties to a contract can orally modify it even if the contract states that all modifications must be in writing. *Hyatt Corp. of Delaware v. Young & Associates*, 2005 WL 3004744, at *3 (Ky. App. 2005); *Adath Israel*, 89 S.W.2d at 319-20.

> In Elliott on Contracts, §§ 1987 and 1989, the following rules are thus in substance stated: That parties who have the right to make a contract have the power to unmake or modify, regardless of self-imposed limitations; that by subsequent agreement based upon a sufficient consideration parties may modify their contract in any manner they choose; and that generally a new consideration is required in order for an attempted modification for a contract to be valid.

*Vinaird v. Bodkin's Adm'x*, 72 S.W.2d 707, 711 (Ky. 1934).

Accordingly, the 1999 Agreements do not prohibit NRC from asserting that the parties orally modified the agreements.

**4)      Whether the Alleged Oral Modification is Supported by Consideration.**

The next issue in determining whether NRC may assert the alleged oral modification of the 1999 Agreements as a defense to Francis's breach of contract claim is whether the modification is supported by new consideration.  If not, NRC cannot assert it as a defense to Francis's breach of contract claim.[4]  Francis argues that, under the terms of the 1999 Agreement, he was not obligated to pay for the treatment and stimulation of the 1999 Wells.  Thus, Francis argues, any modification of the 1999 Agreements that required Francis to pay for the treatment and stimulation expenses had to be supported by consideration flowing from NRC to Francis.  Francis argues that NRC gave him nothing in return for his alleged promise.

NRC asserts that the parties orally agreed to treat and stimulate the wells in order to increase their production.  The Court has determined that NRC asserts that Francis agreed to pay 80 percent of the costs in return for NRC's promise to pay 20 percent of the costs.  "Mutual promises are a valid form of consideration as long as there is some benefit to the promisor or detriment to the promisee." *More v. Carnes*, 214 S.W.2d 984, 991 (1948).  Accordingly, Francis's  alleged oral promise to pay 80 percent of the costs is supported by NRC's promise to pay 20 percent of the costs and the prospect of increased production revenues flowing to both parties.

**5)      Whether the Evidence shows as a Matter of Law that NRC Breached the Agreements before Francis Did.**

Finally, Francis argues that, even if the Court assumes the parties orally modified the 1999

---

[4]  An agreement that lacks consideration is "void."  *Early v. Bradfeild's Ex'x*, 99 S.W.2d 190, 193 (Ky. 1936); *Hardin's Adm'rs v. Hardin*, 256 S.W. 417, 418 (Ky. 1923).  Accordingly, it cannot be asserted even as a defense.  In contrast, an agreement that fails to meet the statute of frauds is not void.  It simply cannot be enforced. *See Montgomery v. Graves*, 191 S.W.2d 399, 400 (Ky. 1945)("The statute [of frauds] does not make void a parol contract of any of the classes. It but prohibits its enforcement and refuses a remedy for enforcement or breach."). Because the agreement that fails to meet the statute of frauds is nonetheless legally effective, it may still be asserted as a defense.  An agreement that lacks consideration, however, has no legal effect at all.

Agreements, he is nonetheless entitled to judgment as a matter of law because NRC was actually the first party to breach the agreements.  Francis argues that NRC began withholding production revenues from him in April 2001 but that it had not actually incurred any treatment or stimulation expenses at that time and, thus, Francis could not have breached the agreement to pay for those expenses yet. (Rec. No. 104, Francis Mem. at 12).

NRC has not disputed that Francis could not have breached an agreement to pay for the treatment and stimulation of the 1999 Wells until such time as NRC actually incurred those expenses.  As support for his argument that NRC did not incur any such expenses until August 2001, Francis relies on an August 2, 2002 letter from Nami to Francis and accompanying spreadsheets. In the letter, Nami states that Francis owes NRC $235,889.12 for expenses associated with the 1999 and 2000 Wells.  (Rec. No. 73, Ex. B to Ex. 0).

The accompanying spreadsheets indicate that this sum is comprised of $130,843 for expenses associated with the 2000 Wells; $64,360.26 for expenses associated with the 1999 Wells; and $40,695.86 for expenses associated with the 1999 and 2000 Wells combined.  As to the $64,36.25 figure, Nami's letter indicates that NRC gave Francis an invoice substantiating this amount at a meeting on September 4, 2001.  But there is no indication in either the letter or the spreadsheets as to when these expenses were incurred.  Thus, a reasonable juror could conclude that the $64,360.26 figure represents expenses incurred prior to April 2001.[5]

Francis also argues that the Court can decide as a matter of law that NRC breached the 1999 Agreements first because there is no evidence that NRC ever demanded any payment from him for

---

[5] While there is not sufficient evidence in the record to permit the court to rule as a matter of law that NRC did not incur these expenses until after April 2001, this may well be an issue that will become clear as a matter of law after the parties have presented evidence at trial.  The same analysis holds true for the $40,695.86 figure.

treatment and stimulation of the wells before it began withholding revenues from him in April 2001. NRC has not addressed this argument.  Accordingly, the Court will assume that Francis should not be deemed to have breached an agreement to pay for the treatment and stimulation of the 1999 Wells until such time as NRC demanded payment from him for those expenses and he refused to pay.

There is no dispute that NRC began withholding production revenues from Francis in April 2001. Thus, the issue is whether there is any evidence in the record from which a reasonable juror could conclude that, some time prior to April 2001,  NRC demanded payment from Francis for the treatment and stimulation of 1999 Wells and Francis refused to pay.

The Court has reviewed the record and finds no correspondence indicating that NRC demanded payment from Francis for the treatment and stimulation of the 1999 Wells prior to April 2001.  On the other hand, it is clear that at some point Francis refused to pay for the treatment and stimulation of the 1999 Wells.  The depositions of Nami and Francis are not clear on when precisely this occurred.  For example, Nami testified that the parties "always talked about what he owed us." (Rec. No. 77, Nami Dep. at 184).  Accordingly, based on the record before it, the Court cannot find as a matter of law that NRC did not request payment from Francis for expenses associated with the 1999 Wells until after it began withholding production revenues from these wells.[6]

For all of these reasons, Francis's Motion for Partial Summary Judgment on his claim that NRC breached the 1999 Agreements must be denied.

## II.  FRANCIS'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON CLAIM FOR BREACH OF 2000 AGREEMENTS.

### A.  FACTS REGARDING THE 2000 AGREEMENTS.

---

[6] Again, however, this issue may well be one that is resolved as a matter of law after the parties have presented evidence at trial.

11

Some time before August 28, 2000, the parties also drafted certain agreements regarding six additional wells leased to NRC (the "2000 Wells")[7]. These agreements were a Participation Agreement, an Operating Agreement and a Selling Agreement (the "2000 Agreements"). (Rec. No. 7, Ex. A, B and C).

NRC asserts that these agreements were, in fact, executed. Francis testified in his deposition, however, that the parties drilled the six wells covered by the 2000 Agreements pursuant to an oral agreement. (Rec. No. 77, Ex. E, Francis Dep., Vol. II at 13, ). Francis's Complaint asserts that the parties only reached an oral agreement regarding the 2000 Wells. The 2000 Agreements were not signed by Francis. The 2000 Operating and Selling Agreements were signed by Nami on August 28, 2000. The 2000 Participation Agreement was not signed by either party.

The following wells were governed by the 2000 Agreements: Delbert Cooper #1, Kenneth Engle #1, Joe Patrick #1, Mike & Delbert Helton #1, Emmanuel Jackson #1, and Raleigh Engle #1. (Rec. No. 77, )(the "2000 Wells").

**1)      Francis Pays NRC $132,000 for Drilling and Completing Each of 10 Wells.**

With these agreements, the parties agreed that development of the wells would be divided into two phases: drilling and completion. (Rec. No. 7, Ex. A, Participation Agreement, § I). As to the drilling phase, Francis agreed to pay NRC $100,000 to drill each well, which was 80 percent of the estimated drilling costs. NRC was to obtain written approval from Francis before drilling each well. Francis agreed to advance NRC $132,000 within five days of the approval of each well. NRC agreed to hold in escrow $32,000 of this payment. (Rec. No. 7, Ex. A, Participation Agreement, § I).

---

[7] The parties agree that the 2000 Agreements covered six additional wells. All versions of the 2000 Participation Agreement in the record, however, state that the agreement covers ten wells.

12

The parties agreed that, after the drilling phase, they would mutually determine whether "it is economically feasible to proceed with the completion phase for each Well.  If the parties mutually agree to proceed with the completion phase such mutual agreement shall be evidenced in writing." (Rec. No. 7, Ex. A, Participation Agreement, § I).

   **2)   Francis Pays 80 Percent of Actual Completion Costs.**

If the parties agreed to proceed with the completion phase, the $32,000 in escrowed funds were to be used for the necessary and ordinary expenses of the completion of the well. (Rec. No. 7, Ex. A, Participation Agreement, § I). If the actual cost of completion for each well was less than $40,000, then NRC agreed to hold 80% of the surplus in trust and to credit the surplus toward completion costs on other wells. If the costs of completion on any well exceeded $40,000, then NRC agreed to give Francis written notice along with documentation of the expenses incurred.  Francis agreed to pay 80 percent of the deficit within five business days of receiving such notice. (Rec. No. 7, Ex. A, Participation Agreement, § I).

   **3)   Unilateral Completion.**

If the parties could not agree to proceed with completion of a well, then either party could complete the well by paying all completion costs.  That party could then retain 100% of the profits from the well until the party had recovered 300% of the necessary and ordinary expenses for the completion phase.  (Rec. No. 7, Ex. A, Participation Agreement, § I).

   **4)   Operating Fee.**

Francis agreed to pay NRC an operating fee of $260 per month per well.  In the event any well produced more than 2100 gallons of oil for more than 30 days, Francis agreed to pay an Operating Fee of $450 per month for those months that the well produced more than 2100 gallons. (Rec. No. 7, Ex. B, Operating Agreement, § 1(a)). The Operating Fee would include all expenses

13

regarding "the operations of the subject well(s), such as service rig work, material, transportation fees and other miscellaneous charges to produce such oil and gas wells."  The parties agreed that "NRC shall not charge Francis additional expenses without prior written consent of Francis."  (Rec. No. 7, Ex. B, Operating Agreement, § 1(b)).

5)   **Payments to Francis**.

The parties agreed that "NRC shall disburse the oil and gas working interest payments to Francis no later than 55 days after the last production day of the month.  Such payments shall accompany a statement showing details of oil and gas production, payments and expenses."  (Rec. No. 7, Ex. B, Operating Agreement, § 2).

6)   **Amendments in Writing.**

The parties agreed that the Participation Agreement could not be amended except in writing. (Rec. No. 7, Ex. A, Participation Agreement, § X(B)).  The parties also agreed that the Operating Agreement could only be amended in writing. (Rec. No. 7, Ex. B, Operating Agreement, § 10).  The parties agreed that the Operating agreement could "not be modified or revised without the written consent and authority of the parties."  (Rec. No. 7, Ex. B, Operating Agreement, § 11).

7)   **Francis's Claim that NRC breached the 2000 Agreements.**

Francis asserts that, pursuant to the parties' agreements regarding the 2000 Wells,  NRC is required to pay him for gas produced from the 2000 Wells and that NRC has breached that agreement by failing to do so. NRC argues that Francis would not consent to treat the 2000 Wells and it exercised its right under the 2000 Agreements to treat the wells and withhold production revenues from Francis until it recovers 300% of its cost.  It is undisputed that Francis paid NRC $64,000 in escrow payments to cover treatment and stimulation of the 2000 Wells.  The dispute is over whether Francis owes NRC for additional treatment and stimulation expenses associated with

14

the 2000 Wells.

Francis argues that it not obligated to pay any additional treatment or stimulation expenses because NRC was required to obtain his written consent before treating any of the 2000 Wells and failed to do so. Francis also argues that, even if he owes NRC for treatment and stimulation expenses associated with the 2000 Wells, NRC's expenses did not exceed the $64,000 he had already paid it.

**B.     ANALYSIS.**

**1)     Whether Francis may Assert an Action to Enforce the Unsigned 2000 Agreements.**

An initial issue is whether the statue of frauds prohibits Francis from enforcing the 2000 Agreements when, it appears from the record, that he never executed them. The agreements conveyed Francis a working interest in the 2000 Wells and, thus, as discussed above, fall under the statute of frauds because they are considered an agreement conveying an interest in real estate.

Where an agreement falls under the statute of frauds, the statute prohibits any action to enforce the agreement unless the agreement is in writing and signed by the "party to be charged." KRS § 371.010.  "As applied to contracts for the sale of real estate, Kentucky courts have uniformly held in a long line of decisions that the party to be charged is the vendor of the real estate, and if the writing is signed by him and it is otherwise sufficient, it will be enforceable by either party." *Sweeney v. Theobald*, 128 S.W.3d 498, 500 (Ky. App. 2004)(citations and quotations omitted).

The 2000 Operating and Selling Agreements were signed by NRC.  Accordingly, whether the statute of frauds requires that those agreements be signed by the party to be charged or by the seller, Francis may assert an action against NRC to enforce the agreements. As to the 2000 Participation Agreement, it was not signed by either party.  But NRC has not asserted the statute of frauds as a defense to Francis's claims, either in its response to Francis's Motion for Partial

15

Summary Judgment or in its Answer. "The statute of frauds is an affirmative defense which generally is waived if not raised as a defense in the pleadings." *TCP Industries, Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 547 (6th Cir. 1981); Fed.R.Civ.P. 8(c)(1). Accordingly, Francis may assert an action to enforce all of the 2000 Agreements.

> **2) Whether NRC was Required to Obtain Francis's Written Consent Before Incurring Completion Expenses.**

The next issue is whether NRC was required to obtain Francis's written consent before incurring completion expenses. The 2000 Participation Agreement provides, "[i]f the parties mutually agree to proceed with the completion phase such mutual agreement shall be evidence in writing." (Rec. No. 7, Ex. A, Participation Agreement, § I, p. 2). However, the agreement further provides:

> In the event a Well has been drilled and the parties cannot mutually agree to proceed with the completion . . . then either party may elect to proceed with the completion . . . , by paying all costs associated with such completion . . . If either party makes the election to proceed without the non-consenting party . . ., then the party electing to proceed . . . shall retain one hundred percent (100%) of the profits, if any, from said Well until the proceeding party has recovered three hundred percent (300%) of the necessary and ordinary expenses incurred for the completion phase . . . .

(Rec. No. 7, Ex. A, Participation Agreement, § I, p. 3).

Thus, NRC was permitted to complete any of the 2000 Wells itself and then withhold all of the revenues from Francis until it recovered 300 percent of its completion costs so long as the parties could not "mutually agree to proceed with the completion."

> **3) Whether there is Sufficient Evidence that the Parties Were Unable to Agree to Complete the Wells.**

The next issue is whether there is sufficient evidence in the record from which a jury could conclude that the parties could not "mutually agree to proceed with the completion" of certain 2000 Wells. Francis appears to argue that the Court should find as a matter of law that the parties never

16

reached such an impasse.  He argues that NRC proposed to treat certain wells, he requested additional information and, the next thing he knew, NRC presented him with invoices demanding payment for treatment and stimulation expenses.  (Rec. No. 104, Mem. at 14).

By letter to Francis dated November 9, 2000, Barry Hayes, NRC's Chief Financial Officer, proposed a  treatment program for three of the 1999 Wells (Reed Helton #1, Bill Mayne #1 and Maudie Napier #4) and  three of the 2000 Wells (Emmanuel Jackson #1, Mike & Delbert Helton #1, and Kenneth Engle #1).  Hayes estimated the total cost for the treatment would be $240,000 and stated that Francis's 80% share of the costs would be $192,000.  He asked that Francis forward that amount within 10 days.

By letter to Francis dated December 29, 2000, Hayes again identified the six wells named above as designated for additional treatment and asked Francis to sign the letter and return it to NRC if he agreed.  Francis responded by an undated letter stating he would like to consider treating only four of the wells: the three 2000 Wells that Hayes' prior letters had identified for treatment (Emmanuel Jackson #1, Mike & Delbert Helton #1, and Kenneth Engle #1) and the Reed Helton #1, a 1999 Well.  Then, by letter to Nami dated January 6, 2001, Francis stated that the December 29, 2000 letter from Hayes did not "represent our understanding" and was not "reflective [of] our most recent discussions."  By letter to Nami dated January 16, 2001, Francis stated he would like to review the logs and expected cost of treating the designated 2000 Wells.

Francis testified that he remembered verbal discussions with NRC in late 2000 regarding the treatment of certain 1999 and 2000 Wells. (Rec. No. 75, Ex. E, Francis Dep. Vol. II. at 38-39). He further testified that he said "let's look at it.  Let's talk about it."  (Rec. No. 75, Ex. E, Francis Dep. Vol. II. at 39).  However, he testified that he never agreed to treat any of the 2000 or 1999 Wells. (Rec. No. 77, Francis Dep. Vol. II. at 39).

17

This is sufficient evidence to at least create an issue of fact as to whether NRC sought Francis's permission to complete some of the 2000 Wells and Francis failed to grant such permission. Thus, a jury should decide the issue of whether the parties were unable to agree to proceed with the completion of certain wells as contemplated by the 2000 Agreements.

> **4)    Whether the Evidence Shows as a Matter of Law that NRC Withheld More Revenues than it was Permitted to under the 2000 Agreements.**

The next issue is whether, even if the parties were unable to mutually agree to proceed with the completion of the 2000 Wells, the Court can nonetheless decide as a matter of law that NRC breached the 2000 Agreements because its expenses in treating the wells did not total more than the $64,000 Francis had already given NRC to cover expenses. Francis argues that the evidence shows that NRC did not incur more than $64,000 in expenses in treating and stimulating the 2000 Wells and, thus, NRC breached the agreements when it began withholding production revenues from him.

The evidence in the record, however, at least creates an issue of fact as to whether Francis owes NRC for completion expenses exceeding $64,000. By letter dated March 12, 2001, Nami sent Francis invoices that he said were "for the completion of the four wells on your 2000 drilling program." (Rec. No. 73, Ex. F). He asks Francis to pay the amount due as soon as possible. The invoices identify the four wells as Emmanuel Jackson #1, Mike & Delbert Helton #1, Joe Patrick #1, and Raleigh Engle. These are all governed by the 2000 Agreements. The attached bill states that the treatment cost was $214,968.05 and that, subtracting Francis's $64,000 escrow, the amount he owed was $150,966.05.

There is no dispute that some of the invoices that NRC sent Francis to substantiate its expenses had been "altered" (Rec. No. 108, NRC Response Mem. at 12), or, as Nami testified, "doctored-up" by NRC employees without his knowledge (Rec. No. 77, Nami Dep. at 166). Thus,

18

Francis's accountant Greg Johnson – who is also his brother-in-law and business partner – went to NRC's London headquarters to review NRC's records. (Rec. No. 104, Francis Mem. at 5). Johnson drafted a summary of his findings in which he stated that Nami told him that the altered invoices were the result "of an embezzlement scheme perpetrated by certain NRC employees over a period of time that impacted several if not all of NRC's customers." (Rec. No. 75, Francis Dep., Ex. 31).

Johnson created a document titled "Summary of Last Invoices Submitted by Nami Resources Related to 2000 Drilling Program" which Francis refers to as the "Johnson Spreadsheet." (Rec. No. 104, Francis Mem. at 15). In the spreadsheet, Johnson identified the relevant wells as the R. Engle, the MD Helton, the J Patrick, the D Cooper, the K Engle, and the E Jackson. (Rec. No. 73, Ex. B. to Ex. O, Aug. 2, 2002 Letter and attachments). These are all 2000 Wells. Jackson identifies the total completion and treatment costs on these four wells as $243,554. He identifies $194,543 as Francis's 80% share of the costs. Subtracting the $64,000 in escrow payments already paid by Francis, Johnson identifies $130,843 as the amount Francis owes NRC. (Rec. No. 73, Ex. P).

Francis, however, asserts that the amount Johnson determined Francis owes NRC is wrong because Johnson simply used NRC's line-item categories in his review. Thus, if NRC categorized an item as a drilling or completion expense, Johnson did not question that. Francis states that he determined that most of the expenses listed as "completion" costs on Johnson's spreadsheets were actually "drilling" costs which he had already paid and that other items listed as "completion costs" were not actually "completion" costs under the parties' agreements. (Rec. No. 104, Francis Mem. at 5-6).

Francis asserts that Nami admitted in his deposition that the "bulk" of the charges listed as "completion" charges on the Johnson Spreadsheet were not legitimate. Francis also asserts that NRC representative Vicki Guess testified that the only legitimate treatment and stimulation expenses on

19

the Johnson Spreadsheet totaled $33,239.00. (Rec. No. 104, Francis Mem. at 15-16).  The Court has reviewed the portions of the Nami and Guess testimony cited by Francis in support of this assertion and finds that they do not resolve as a matter of law the amount of expenses incurred by NRC to treat and stimulate the 2000 Wells.  This is a material factual issue which prohibits summary judgment on Francis's claim that NRC breached the 2000 Agreements.

Accordingly, Francis's Motion for Partial Summary Judgment on his claim that NRC breached the 2000 Agreements will be denied.  As to Francis's request that the Court rule as a matter of law that he is entitled to the remedies of rescission and pre-judgment interest, for the reasons explained further below, the Court will deny this request.

### III.    NRC'S MOTION FOR SUMMARY JUDGMENT.

In its Motion for Partial Summary Judgment, NRC asks the Court to dismiss Francis's tort claims and his request for punitive damages, rescission, and constructive trust.  The Court will address each of these issues in turn.

### A.    Breach of Implied Covenant of Good Faith and Fair Dealing.

In his Complaint, Francis asserts that NRC breached the implied covenant of good faith and fair dealing contained in both the 1999 and 2000 Agreements.  Kentucky law recognizes that, "[w]ithin every contract, there is an implied covenant of good faith and fair dealing, and contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Farmers Bank and Trust Co. of Georgetown, Kentucky v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky.2005).

Under Kentucky law, a breach of the covenant of good faith and far dealing gives rise to a contract action and, at least where a special relationship exists between the parties such as that between an insurer and an insured, a tort action for bad faith.  *See Ennes v. H & R Block E.Tax Servs.*, 2002 WL 226345, at *2-3 (W.D.Ky.2002); *Davidson v. American Freightways, Inc.*, 25

20

S.W.3d 94, 102 (Ky.2000).

Though Francis's complaint does not specify that his bad faith claim is a tort claim, his response brief clarifies that it is. (See Rec. No. 107, Francis Response Mem. at 11-12).  Thus the issue is whether Kentucky law would recognize some sort of special relationship between NRC and Francis that would permit Francis to assert a bad faith tort claim against NRC.  In *Ennes*, the district court summarized the relevant portions of *Corpus Juris Secundum's* discussion of a bad faith tort action as follows:

> Within every contract there is an implied covenant of good faith and fair dealing. But, the tort itself arises from a violation of a duty to act in good faith that is imposed by the common law, not by the terms of the contract. Thus, not all contracts impose a duty that, if breached in bad faith, may be remedied in tort. Only in contracts involving "special relationships" not found in ordinary commercial settings do courts find a tort duty of good faith. The most notable, but not exclusive, example are contracts between insurers and insureds, where distinct elements are present, such as: unequal bargaining power, vulnerability, and trust among the parties; nonprofit motivations for contracting (e.g., peace of mind, security); and inadequacy of standard contract damages.

*Ennis*, 2002 WL 226345, at * 2 (citing 86 C.J.S. Torts § 5 at 630-32 (1997)(citations omitted).

Francis has not cited any cases, in Kentucky or otherwise,  recognizing a bad faith tort action in any relationship other than an insurance relationship. In *Davidson v. American Freightways, Inc.*, 25 S.W.3d 94 (Ky. 2000), the Kentucky Supreme Court explicitly stated, "we thus hold that the UCSPA [Kentucky's bad faith statute] and the tort of 'bad faith' apply only to those persons or entities (and their agents) who are 'engaged. . . in the business of entering into contracts of insurance.' KRS 304.1-040." *Id*. at 102.  Further, Francis has not put forth any basis for this Court to find a special relationship between him and NRC.  Accordingly, Francis's bad faith tort claim will be dismissed.

### B.    Conversion Claim.

21

To prove a conversion claim, Francis must show the following:

(1) the plaintiff had legal title to the converted property; (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion; (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment; (4) the defendant intended to interfere with the plaintiff's possession; (5) the plaintiff made some demand for the property's return which the defendant refused; (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and (7) the plaintiff suffered damage by the loss of the property."

*Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon*, 157 S.W.3d 626, 632 n.12 (Ky. 2005)(quoting 90 C.J.S. Trover and Conversion § 4 (2004)).

NRC argues that Francis cannot bring a conversion claim because the rights that he alleges NRC interfered with were created by contract. Thus, NRC argues, Francis's remedy lies solely in a breach of contract action. In *Davis v. Siemens Medical Solutions USA, Inc.*, 399 F.Supp.2d 785 (W.D.Ky. 2005), the court recognized that "a conversion claim and contract claims are not always incompatible" but that a conversion claim cannot be brought where "the property right alleged to have been converted arises entirely from the contractual rights to compensation." *Id*. at 801. More recently, the Kentucky Court of Appeals recognized that "[t]he failure to perform a contractual obligation typically does not give rise to a cause of action in tort. . . . However, if a plaintiff can establish the existence of an independent legal duty, he may maintain an action in tort even though the acts complained of also constitute a breach of contract." *Mims v. Western-Southern Agency, Inc.*, 226 S.W.3d 833, 836 (Ky. App. 2007)(quoting *Jones v. Hartford Life and Accident Ins. Co.*, 443 F.Supp.2d 3, 5 (D.D.C.2006)).

In his complaint, in support of his conversion claim, Francis asserts that NRC refuses to give him "production proceeds from the 1999 Wells and 2000 Wells properly due [him] under the 1999 Agreements and 2000 Oral Agreement . . . ." (Rec. No. 1, Complaint, ¶ 34). He also asserts that,

"[i]n addition to his contractual right to receive production proceeds, Francis has valuable ownership interests in the 1999 and 2000 Wells which [NRC] has" converted to its own use. (Rec. No. 1, Complaint, ¶ 35).

In his response to NRC's Motion for Summary Judgment, Francis argues that his conversion claim is  based on his right to possess the gas in the wells, not on his right to the revenues the wells have produced.  He argues that NRC has wrongfully possessed both the gas in the ground and the gas that the wells have produced since April 2001. (Rec. No. 107, Francis's Response at 9).  Francis argues that his ownership interest in the gas was created by certain assignments from NRC to him that are referenced in the 1999 and 2000 Agreements, but not by the 1999 and 2000 Agreements themselves.

Whether Francis's rights to the gas arise from the 1999 and 2000 Agreements or from the assignments, Francis's remedy for NRC's alleged breach of its obligation to deliver possession of the gas to him lies, not in a tort action, but in an action for breach of the contract(s) creating that right and obligation. *See Pioneer Resources Corp. v. Nami Resources* Company, 2006 WL 1778318, at * 11-12 (E.D.Ky. 2006)(conversion claim dismissed where plaintiff claimed that defendant wrongfully deprived him of gas and proceeds and plaintiff's rights to gas and proceeds were defined by contract). *But see, Ashland, Inc. v. Windward Petroleum, Inc.*, 2006 WL 1913364 at * 6-7 (E.D. Ky. 2006)(when a third party informs a debtor that it may pay its debt to the creditor by paying the third party and then the third party wrongfully keeps the funds instead of giving them to the creditor, the creditor can assert a conversion claim against the third party because the creditor's right to payment arose from a contract with the debtor not with the third party).

Accordingly, the Court will dismiss Francis's claim that NRC has converted either the gas in the wells or the proceeds from the wells for its own use.

### C.    Request for Rescission.

In his Complaint, Francis asks the Court to order that the 1999 and 2000 Agreements are rescinded and that NRC return the amounts he has paid it with interest.  In his Motion for Partial Summary Judgment, Francis asks the Court to rule that he is entitled to remedies of rescission and pre-judgment interest as a matter of law.  With its Motion for Partial Summary Judgment, NRC asks the Court to rule as a matter of law that Francis is not entitled to these remedies.

"It is elementary that a contract may not be rescinded unless the non-performance, misrepresentation or breach is substantial or material. The Court does not look lightly at rescission, and rescission will not be permitted for a slight or inconsequential breach." *Evergreen Land Co. v. Gatti*, 554 S.W.2d 862, 865 (Ky. App. 1977).

Francis asserts that NRC breached the 1999 and 2000 Agreements when it ceased to pay him any revenues from the oil and gas wells as it was obligated to do under the agreements.  There is sufficient evidence in the record to submit the issue of materiality or substantiality to a jury. However, recision of a contract "will not be allowed even for a substantial breach unless the former status of the parties can be restored." *C.C. Leonard Lumber Co. v. Reed*, 236 S.W.2d 961, 962 (Ky. 1951)(citing *Beattie v. Friddle*, 17 S.W.2d 246 (Ky. 1929)(rescission of contract even for substantial breach not permitted where "the position of the parties has been changed so that former status may not be restored").  "An absolute and literal restoration of the parties to their former condition is not required; it is sufficient if such restoration be made as is reasonably possible and such as the merits of the case demand." *Black Motor Co. v. Green*, 79 S.W.2d 409, 411 (Ky. 1934)(quotations and citation omitted).

> To state a cause of action for rescission of contract, a plaintiff must establish that the parties can be placed in status quo ante and has the burden of proving that the status quo may be restored and that he or she has restored, or offered to restore, the other

24

party to the status quo ante. Rescission is generally not available where the parties' condition as it existed prior to bargaining cannot be restored. However, in equity a contract may be rescinded although the parties cannot be placed in status quo, where the equities between the parties can be balanced.

17B CJS Contracts § 488.

In this action, the parties could not be restored to their former status. This was not a simple real estate transaction. Contrary to Francis's assertions, the parties will not be restored to their former status by simply returning NRC's wells to it and Francis's payment for the wells to him. Prior to this transaction, NRC owned 16 oil and gas wells that had never been drilled. The production capabilities of the wells were unknown and the parties bargained on that basis. As a result of this transaction, NRC has expended time and money drilling and operating the wells and the production capabilities of the wells are now known. Those capabilities have apparently been a disappointment to both parties. Nevertheless, this is not grounds to rescind the agreement.

Francis has offered to return the drilled wells to NRC if the agreement is rescinded. However, this is not sufficient to restore NRC to its former status. Accordingly, Francis has not carried his burden of establishing he is entitled to rescission and the court will deny his request for this relief. Francis has put forth no basis for the awarding of prejudgment interest other than his entitlement to rescission and, accordingly, the court will also deny his request for this remedy.

### D.    Unjust Enrichment and Constructive Trust.

In his Complaint, Francis also asserts a claim for unjust enrichment against NRC, asserting that, in accordance with the terms of the 1999 and 2000 Agreements, he paid NRC $1.5 million to drill the 16 wells under the 1999 and 2000 Agreements and that, in return, NRC was obligated to pay him production proceeds from the wells. He asserts that instead, "[b]ased upon false representations as to the cost and necessity of work allegedly performed on some of the wells, [NRC] is withholding

25

production payments from Francis, and is keeping the revenues generated by the wells Francis financed." (Rec. No. 1, Complaint, ¶¶ 38-42). He asserts that, as a result, NRC has been unjustly enriched.

A claim for unjust enrichment is appropriate where there is insufficient evidence of the parties' agreement but nevertheless there is sufficient evidence that one party has conferred a benefit upon the other. In such circumstances, the plaintiff can assert there was a "contract implied by law" which "allows for recovery *quantum meruit* for another's unjust enrichment." *Perkins v. Daugherty*, 722 S.W.2d 907, 909 (Ky. App. 1987). "It is not based upon a contract but a legal fiction invented to permit recovery where the law of natural justice says there should be a recovery as if promises were made. The courts supply the fiction of the promise to permit the recovery." *Id*.

However, "the doctrine of unjust enrichment has no application in a situation where there has been an explicit contract which has been performed." *Res-Care, Inc. v. Omega Healthcare Investors, Inc.*, 187 F.Supp.2d 714 (W.D.Ky. 2001)(citing *Tractor and Farm Supply, Inc. v. Ford New Holland, Inc.*, 898 F.Supp. 1198,1206 (W.D.Ky. 1995)); *See also Codell Const. Co. v. Commonwealth*, 566 S.W.2d 161, 165 (Ky. App. 1977). With his unjust enrichment claim, Francis seeks production revenues that it claims that NRC has wrongfully withheld from him under the terms of the 1999 and 2000 Agreements. Because Francis's right to the production revenues arises from the express agreements between the parties, his unjust enrichment claim must fail.

In his response to NRC's Motion for Summary Judgment, Francis argues that he asserts the claim "[i]n the event the evidence shows that there was not a meeting of the minds as to one or more terms of the 2000 agreement." (Rec. No. 107, Francis Response Mem. at 16). Citing *Meem Haskins Coal Corporation v. Pratt*, 187 S.W.2d 435 (Ky. 1945), Francis asserts that a claim of unjust enrichment is appropriate where there is a written agreement between the parties but the terms of the

agreement are in dispute.

In *Meem Haskins*, the plaintiffs asserted that the defendant coal company had failed to pay them for the construction of a building they built on the coal company's property pursuant to an agreement between the parties. However, there was a dispute between the parties regarding the price that the plaintiffs were to be paid. *Id.* at 771. The issue was whether the trial court should have given an instruction that the plaintiffs could be compensated under an unjust enrichment theory where the parties had entered into an express contract. *Id.* at 772. The court stated:

> Ordinarily, where an express contract is entered into between parties but they differ as to its terms and there is evidence tending to support the claim of each of them, it is for the jury to determine what the terms of the contract were and there can be no recovery on the quantum meruit. However, there should be a recovery on a quantum meruit theory where the plaintiff has performed services under what was intended to be an express agreement as to all the terms, but there is proof that there was not a meeting of the minds of the parties on one or more of the terms. Under such circumstances, the law presumes that the defendant agreed to pay the reasonable value of the services. It is a contract implied in fact and differs from an express contract only in the character of evidence necessary to establish it.

*Id.*

Thus, the *Meem Haskins* holding applies where it is clear that the parties agreed that one party would perform a certain service for another but other terms of their agreement are in dispute. In such a case, if the party performs the agreed-upon service but the other party refuses to pay, the party performing the service can assert a claim of unjust enrichment to recover a reasonable compensation from the party benefitting from the service. *See Simmons v. Atteberry*, 310 S.W.2d 543, 545 (Ky. 1958)(stating that, "after services have been furnished and accepted the fact that he compensation contemplated is too indefinite does not prevent recovery of reasonable compensation.")

Francis does not claim that he performed a service for NRC for which he was not

compensated.  Instead, he argues that the parties expressly agreed that he would receive certain production revenues from the oil and gas wells but NRC has failed to pay him.  Accordingly, Francis's unjust enrichment claim mirrors his breach of contract claim and must be dismissed.

A constructive trust is a remedy for unjust enrichment.  *See In re Omegas Group, Inc.*, 16 F.3d 1443, 1449 (6th Cir. 1994) (stating, "[a] constructive trust is merely a means by which the court can say that the defendant must relinquish to the plaintiff property that represents an unjust enrichment.").  Because Francis's unjust enrichment claim must be dismissed, his request for a constructive trust must also be denied.

### E.      Punitive Damages.

The sole remaining claim by Francis in this action is his breach of contract claim. "Kentucky has long followed the general rule that punitive damages ordinarily are not recoverable for a breach of contract." *Ford Motor Company v. Mayes*, 575 S.W.2d 480, 486 (Ky. App. 1978); *See also* KRS 411.184(4).  Accordingly, Francis's request for punitive damages will also be denied.

### IV.      CONCLUSION.

For all of these reasons, the Court hereby ORDERS as follows:

1)      Francis's Motion for Partial Summary Judgment (Rec. No. 104) is DENIED;

2)      NRC's Motion for Partial Summary Judgment (Rec. No. 105) is GRANTED;

3)      Francis's claims for conversion, unjust enrichment and breach of the covenant of good faith and fair dealing are DISMISSED and his request for rescission, pre-judgment interest, a constructive trust and punitive damages are DENIED;

4)      the sole causes of action asserted by Francis that remain in this action are his claims that NRC breached the 1999 and 2000 Agreements; and

5)    this matter is set for a scheduling conference to be held on **April 10, 2008 at 1:30**

**p.m. in London, Kentucky**.  The parties should be prepared to discuss scheduling

matters and any pending motions.

Dated this 28th day of March, 2008.

**Signed By:**

**_Karen K. Caldwell_**

**United States District Judge**